The Chief Justice being one of the stockholders in the State Bank at Trenton, gave no opinion in the cause.
Ford, J.
The defendants, having been indicted for conspiracy at the Hunterdon Quarter Sessions of February, *298] 1827, caused the *record of the indictment to be-removed into this court, and here moved to quash it upon certain objections in point of law, which were submitted upon argument to the consideration of the court.
The first objection to the record is that the grand jury were not lawfully impanelled or returned to the sessions. It appears that the sheriff presented two panels for a grand jury; that he filed both of them on the first day of the-term; in each of which the names of the grand jurors are-the same; and that the only difference between them lies in their caption ; the caption to the first panel being no more than these three words, “ February Sessions, 1827;” not shewing that the persons were returned to make a grand jury, nor by what authox'ity, nor for what county, nor for what court. The caption! given to the second panel is complete in all these particulars, and runs as follows : “ I, Gabriel Hoff, sheriff of the county of Hunterdon, by virtue of the statute in such case made and provided, have caused to come before the court of General Quarter Sessions of the *371 Peace for said county, on the first Tuesday in February, 1827, to make a grand jury, to enquire for the state of Hew Jersey in and for the said county, the following good and lawful men.” The prosecutor on the part of the state conceded that the first was the only panel that existed at the time the grand jury was sworn, and that the sheriff made out the second panel afterward; but it was filed in court on the same day, before any bills were presented. The counsel for the state endeavored to sustain the caption to the first panel, and referred to the act of the second of Hovember, 1822. It provides “ that the respective sheriffs of the several counties shall cause to come before the Courts of General Quarter Sessions of the Pea.ce of the several counties in this state, at the times and places of holding their respective courts, twenty-four good and lawful men to serve as grand jurors, and so many good and lawful men to serve as petit jurors as shall be necessary, and that without any precept being issued for those purposes.” This statute did away the old precept, which had always shelved the authority for convening the grand jury, and substituted the statute itself in place of that precept; but it did not do away the established practice of shewing on record the authority by which the jury were convened; and that omission in the record cannot be cured by any guess work, intendment or presumption. In criminal prosecutions, where men are in jeopardy as respects their reputation, estate, personal ^liberty, and life itself, nothing can be supplied by [*299 way of intendment or presumption, that ought to appear on the record. The statute substitutes itself in place of the precept that was formerly issued; and the sheriff must make his return in obedience to the statute, just as much as he made it formerly in obedience to the precept. In the case of The State v. Nichols, 2 South. 543, this court declared, that a grand jury has no authority to enquire and present, unless they appear to be legally impauneled. How the caption of the first panel does not shew that the grand *372 jury were returned by the authority of the statute ; nor for what county they were. returned; • nor that they were returned to make a grand jury; nor for what court they were returned; for- though one of the three unintelligible words at the head of the panel is "sessions,” there are sessions of oyer and terminer as well as sessions of the peace, and this does not specify either. It was said that the entry of the clerk on the minutes would shew that they were returned for a grand jury; that it would shew likewise the county and the court. But the clerk cannot supply these deficiencies; the statute commits these high powers to the sheriff, and no more authorizes the clerk to officiate in them than it' does the cryer or the constable. The late decision of the court in The State v. Arrowsmith was in perfect accordance with these sentiménts, and would rule the present case. There the caption contained only four words, “ Somerset sessions, such a term it was in the handwriting • of the sheriff himself, but it had not his name subscribed to it, nor was it called in the caption a grand jury, nor was it alleged to be returned by authority of the statute; and the court held it to be insufficient in toto, and quashed the indictment. I have been the more particular in these objections to the caption of the first panel, and its incompetency in point of law, lest any one should suppose that it had received the countenance or sanction of this court, and so a highly reprehensible mode of returning grand jurors, which lies at the foundation of the record, should creep into use at the sessions or the Oyer and Terminer.
But there is a second panel connected with this record; it was filed as a record of sessions the same day as the former, together with a caption shewing that it was a list of names returned for a grand jury to the Court of General Quarter Sessions of the Peace for the county of Hunterdon, by the sheriff of that county, in virtue of the high authority *300] of the statute; and it is complete in all its *parts. What good reason has been offered for the rejection of this *373 valid panel, and the adoption of one altogether worthless and void ? The sessions have made it a regular record of their court, without their order, verbal or written, nothing can go lawfully on their files ; and they have returned this as part of their record. It is said that the jury was called and sworn by the first panel; but if they were lawfully impanelled and returned, it is evidently unimportant from what list they were called; the clerk might do it from the first or the second, or a copy of either, or from memory if he was able, provided that he called and swore the right persons. If there is a good caption, and the right jurors appear to be sworn, the court will not enquire what list the clerk had before him. But it is objected that the second panel was not in existence at the time the grand jury was sworn. I insist that it did exist, in contemplation of law at the very time; and that it was the only panel acted upon in court. The sheriff returned a void panel; the court refused to accept it in that form, as is frequently the case at oyer and terminer, and ordered it to be amended according to law; this amendment was made the same day, and as soon as the clerical execution of the order could be accomplished. All this is plainly inferrable from the record before us. In the meantime the court considered the amendment, and the order for it, as one and the same thing, and on every principle of amendments they had a right to do so. It was not necessary to stop the business of tho court and arrest the swearing of the grand jury while the sheriff was making the amendment ordered, and in contemplation of which the court was acting. The record is therefore complete as respects the impanneling and return of the grand jury, and there is no good ground for quashing the indictment on this account.
Secondly. The defendants object to the charge in the indictment. They say, that admitting everything alleged in it to be true, it does not amount to an indictable offence. The charge is, that the defendants, intending to defraud the *374 State Bank at Trenton, conspired together to obtain large sums of money from it, by means of several checks to be drawn on the cashier, when they respectively had no funds in the bank for the payment of said checks ; then it charges, that in pursuance of such conspiracy each defendant did obtain a certain large sum of money from the bank, and the indictment concludes, to the great damage of the bank.
Now if a conspiracy to defraud the bank, by drawing *301] their checks *on the cashier when they had no funds ' there, be an indictable offence, the defendants may be convicted of it, although they never put the conspiracy in execution. If two or more persons conspire to murder I. S., they may be indicted and convicted of the conspiracy, though the murder of I. S. never ensued, and though the conspirators took no step towards putting the conspiracy in execution. The carrying of a conspiracy into execution is a great aggravation of it, but makes no constituent part of the- offence. In 2 Hawk. ch. 72, sec. 2, it is declared that not only they who cause a man to be falsely indicted, are indictable; but they who conspire to cause it to be done, xohether it be done or not. So Holt, C. J. says, in Rex v. Best, 6 Mod. 186, a conspiracy, without more, is a crime; the very agreeing together to charge one falsely with a crime, is a consummate offence. In Rex v. Edwards 8 Mod. 321, he says, a bare conspiracy is a crime, though no act be done in consequence of it. In Saville v. Roberts, 1 Ld. Raym. 1179, he says, conspiracy though it be not put in execution, is a crime, and punishable in the leet. In The Commonwealth v. Judd, 2 Mass. 329, Parsons, C. J. says, the offence is complete when the conspiracy is made • any act in pursuance of it is no constituent part of the crime, but merely aggravation. "We may therefore lay out of present view that part of the indictment which is merely in aggravation of the crime, in order to fix our attention more clearly on the crimeutself.
The charge then is that of conspiracy; and the counsel for the state insists that the very term conspiracy, is always *375 taken, in malla parte, in an evil or criminal sense. 2 Bur. 997. It may be so when taken by itself; but when used in connection it assumes, either an evil or innocent meaning according to the nature of its object, or the means it meditates to employ. A combination of persons to commit murder must be considered in an evil sense on account of the wickedness of its object; so a combination to obtain the public reward by prosecuting a person to conviction for highway robbery is lawful in its object; but if the means to be employed are perjury and the subornation of witnesses, the combination becomes a shocking evil, on account of the turpitude of the means; and in both cases the term conspiracy is to bo taken in mala parte. But on the other hand, if a combination meditates the attainment of a lawful object, by honest means, as .if two or more combine and conspire to carry on a lawful manufacture, by means of their industry and credit, such combination or conspiracy is never taken *iu an evil sense. We can determine nothing [*302 therefore from the mere word itself, without investigating the object of the conspiracy, and the means that were to be used by the persons, conspiring. This brings ns to an immediate consideration of the object in the present case, and of the means that were to be employed. The object charged in the indictment is to defraud the president, directors and company, of tho State Bank at Trenton; the means charged are, by checks to be drawn on the cashier, when the defendants had no funds in that bank for the payment of their drafts. And the question is, whether this object, considered in itself, or in connection with those means, constitutes an indictable offence. One argument in proof of its being indictable, was attempted to be drawn from the abstract meaning of the word to defraud; and it was shewn that Walker explains it by approximating terms, signifying to rob, to deprive, to cheat. It is clear, however, that this charge is not for a robbery of the bank by putting in fear; it is no less clear that an indictment for depriving tho bank *376 of money could not be maintained. The last meaning given by Mr. Walker is to cheat; but cheating is not always indictable; it is never so unless when effected by false tokens, or such methods as people cannot by any ordinary care or prudence be guarded -against. It must be a cheat that affects the public, such as selling by false weights and measures, or the use of false tokens; therefore the selling of an unsound horse as and for a sound one, though it be a cheat, is not indictable-; the buyer should be more on his guard. 2 Bur. 1129, Rex v. Wheatley. So where a defendant pretending to be sent by S. for twenty pounds, obtained the money, whereas S. did not send him, the court said it was no crime unless he came with false tokens ; shall we indict one man for making a fool of another ? let him bring his action; and-the indictment was quashed. Rex v. Jones, 2 Ld. Raym. 1013, 1 Salk. 379, and 6 Mod. 105, the same case. If, therefore, to defraud means to cheat, it affords one-conclusive argument; because to cheat a private person is not indictable, without it is connected with false tokens; and drawing a bill on a banker in whose hands the drawer had no funds, was decided not to be a false token, in Rex v. Lard, 6 Term Rep. 565. A conspiracy to cheat the public in' general is an indictable offence. This may render it necessary to enquire to what class of persons the president, directors and company of the State Bank at Trenton, belongs *303] in law; whether they are public or private *persons. They are a corporate body in law; they, may sue and be sued, contract and be contracted with; but their actions at law are private suits, their agreements stand on the footing of private contracts, and are enforced only by civil actions; offences against them stand on the footing of offences against an individual person, a citizen, or number of citizens doing business under a firm; and they are distinct from the state and all its political sub-divisions, such ' as counties and townships; their agents are not public officers, and they have no political or judicial powers; a *377 conspiracy to defraud a mercantile house or a private banker would bo just as indictable as one to defraud the president, directors and company of the State Bank at Trenton; and they are private persons to all the purposes of the present case.
The question now fairly arises, whether an indictment lies for a conspiracy to defraud an individual, or to injure him in his property, trade or reputation. In 3 Inst. 144, wo find that it will not; conspiracy is there represented to be an agreement between two or more, to indiet an innocent person falsely and maliciously; and the great learning of Lord Coke, together with the numerous authorities there cited, lead to a firm belief that the common law as understood in his time, carried conspiracy no further than to the single act of getting an innocent man indicted by malice and false evidence. It is also very remarkable, that in that accurate and celebrated work entitled “ Commentaries on the Laws of England,” Judge Blackstone, even so late as his time, should have adhered to the same doctrine, and represented conspiracy in no other light than a combination to indict an innocent man falsely and maliciously, of felony. 4 Bl. Com. 135. It is no less remarkable that our own penal code, Rev. Laws 258, sec. 53, should carry the offence no further, and merely represent conspiracy to be a combination to get a person indicted by means of malice and false evidence; as if purposely to maintain the doctrines expressed in the institutes and commentaries, and not to embrace any other kinds of conspiracy. It is certain that our statute did not create a new offence; it was always indictable to conspire to get an innocent man indicted by malice and false evidence ; the statute is only declarative of the common law. What strengthens the idea that our own legislature intended to admit of no other kind of conspiracy than that mentioned in the fifty-third section, arises from their having enacted, Rev. Laws 462, sec. 1, that no person convicted of *con- [*304 spiracy shall ever afterward be sworn as a witness in any *378 cause; whereas there are a great many cases of conspiracy in the English books, where the loss of liberam legem does not ensue a conviction. See note 4, by Mr. Christian, in 4 Bl. Com. 135. Persons convicted of conspiracy in this state cannot be sworn as witnesses afterward, and by necessary consequence cannot be sworn or serve on juries; they lose their liberam legem; that is, the qualities of good and lawful men forever after. How far this awful disqualification affords an argument against extending the offence of conspiracy beyond the limits assigned to it in the institutes, the commentaries and our own penal code, is well worthy -of consideration. On the other hand it is not to be denied that there are decisions in some of the English books, before our revolution, and a multitude since that period, -which carry the doctrine to an almost infinitely greater extent. Thus an indictment has been maintained for a conspiracy to accuse one of being the father of a bastard child, 6 Mod. 185; to get a person to run booty in a foot race, 6 Mod. 42 ; to get a parish pauper married to a man -who was a pauper in another parish, 8 Mod. 311; to raise workmen’s wages, 8 Mod. 11; to sell a base mixture as and for port wine, 2 Ld. Raym. 1179; to put grease in a card maker’s paste, 1 Stra. 144; to seduce a female to prostitute her innocence, 3 Bur. 1344; to bribe commissioners of the treasury, 2 Campb. 23.0; to cause themselves to be reputed persons of property in order to defraud tradesmen, 1 Campb. 399; to personate another in marriage, 1 Leach 38. It is useless to enumerate more cases. The immeasurable extent to which conspiracy has been carried beyond the limits of our penal code, may be estimated from a passage in 3 Chit. Cr. L. note p. wherein the author arranges conspiracy last in the whole catalogue of crimes, because it appertains to every other crime. Therefore, according to the English books, an indictment lies for a conspiracy by two or more, to commit murder, homicide, treason, arson, rape, burglary, forgery, assault, battery, mayhem, larceny, escape, rescue, extortion, *379 bribery, malicious mischief, offences against tho public health, the public peace, public police and economy, and every species of public crime and misdemeanor, though such crime or misdemeanor was never perpetrated, but only meditated and conceived in the mind. Now whether conspiracy is limited in New Jersey to the single case-mentioned in the institutes, the commentaries, and our own penal code, or comprehends * every possible ease of crime or misdemeanor [*305 that the human mind can conceive, are questions worthy of mature consideration ; but they are questions which I mean neither to discuss at present, nor to intimate an opinion upon them. But I do mean to say that such are, at least, the outside limits, the very ne plus ultra of the doctrine. Conspiracy is limited, at least, to combinations to commit an act, which, if committed, would be an indictable offence. There are authors who push the doctrine beyond even this limit; who say that a combination to prejudice a private person, either in his property, trade or reputation, is indictable as a conspiracy. Thus in 3 Chit. Crim. Law 903, lie says that “ all confederacies wrongfully to prejudice another, are misdemeanors at common law; whether the intention is to injure his property, his person, or his character.” And Archbold, 390, follows him in this respect, and says the same thing. It is this extension of conspiracy to private injuries not otherwise of an■ indictable nature, and in which the public have no concern, to which I object, and insist that it cannot bo maintained, neither on the principles of the common law, nor by adjudged cases. The principles of the common law have clearly distinguished between public and private wrongs from the earliest ages to the present time. Thus Blackstone understood it; he says, “ wrongs are divided into two species, the one private and the other public.” 4 Bl. Com. 1. Again he says, “ the distinction of public wrongs from private consists in this, that private wrongs are an infringement of the civil rights which belong to individuals; public wrongs are a breach of *380 the public rights and duties due to the whole community.” Id. 5. And again, “ wrongs are divisible into tw.o sorts or species; private wrongs and public-wrongs.” 3 Bl. Com. 2. Therefore, to convert mere private injuries into public wrongs, is contrary to the very first principles of the common law. And I say, after a full examination, that there is no adjudged case of authority, where conspiracy has been held to lie, unless for an indictable offence independent of the conspiracy. Mr. Archbold, in page 390, collects all the cases supposed to maintain the contrary doctrine, but they fall.infinitely short of his principle; they are all for offences of an indictable natv,re, independent of the conspiracy; none of them were maintained on any other ground. This will clearly appear from the cases themselves, which I shall examine in the order he adduces them. The first is that of *306] Rex v. Macarty and another, 2 Ld. Raym. 1179; *it was a conspiracy to impose pretended wine on a man, in exchange for one hundred and eighteen pounds worth of hats; one of the defendants pretended to be a wine merchant, the other to be a London broker. The court had great difficulty in making this out to be an indictable offence, or anything more than a private injury. It was twice argued before them. The same case is reported in 6 Mod. 301. Finally Chief Justice Holt declared it was a cheat in the hats by means of false tokens. How, independent of all conspiracy, it is an indictable offence, by statute as well as at common law, to cheat by false tokens, and on that ground alone the indictment was maintained by the court. How surprising it is that Mr. Archbold should cite this as an instance of conspiracy maintained for a mere-private injury, in which there was no semblance of public wrong but the conspiracy itself. He is equally unfortunate in the next case, of Rex v. Robison and Taylor, 1 Leach. 38. Mary Robison, the servant of a bachelor, conspired with Taylor, a porter, to personate her master and marry her; she stole the bachelor’s coat, shirt, neckcloth and wig; they were *381 assumed by Taylor, together with the name of Mr. Holland, the bachelor, and in this false name, supported by these false tokens, he was married by the name of Holland to Mrs. Eobison, in order to defraud and injure the bachelor. Who does not see in this a fraud by false tokens indictable at the common law, independently of the conspiracy and of the private injury. The next is the case of Rex v. Eccles, for which he cites 1 Leach. 274, but this is a mistake; the case is to be found in 13 East. 230, note a. It was a conspiracy to prevent one II. B. from exercising the trade of a tailor. Lord Ellenborough, C. J., says, “ The King v. Eccles was considered a conspiracy in restraint of trade, and so far, a conspiracy to do an unlawful act affecting the public.” See Rex v. Turner, 13 East. 231. The next case is cited from 1 Hawk. ch. 72, sec. 2, but more fully stated in Rex v. Best et al., 6 Mod. 185; a conspiracy to charge a man with being the father of a bastard child; in other words, to charge him with fornication, which is an indictable offence by our statute. In England it is punishable in the spiritual court as a crime; Holt, 0. J., said, “If it be a crime by any law the conspiracy is indictable. The next is from 3 Maul and Selw. 67, a conspiracy to raise the prices of the public funds as being a fraud upon the public. This speaks for itself. Rex v. Roberts and another, 1 Campb. 399, was a conspiracy by the defendants, who wore in low circumstances, *to cause themselves to be reputed men of [*307 property, in order to defraud tradesmen. Lord Ellenborough called it a conspiracy to carry on the business of common cheats; which is an indictable offence against the public, independently of the conspiracy. The next is Rex v. Henry and another, 2 East P. C. 858, a conspiracy to issue and negotiate bills in the name of a fictitious and pretended banking firm to defraud the public; here was an indictable offence independent of the conspiracy ; an offence against the public; and the case speaks for itself Rex v. Tarrant, 4 Bur. 2106, was not a case of conspiracy, for there was but *382 ■one defendant; it was an information against him for a public offepce against a parish. There are other cases in the books, not cited under this head by Archbold; but they are all resolvable into public wrongs; such as journeymen combining not to work till they get an advance of wages, an offence in., restraint of trade; so conspiring to hiss at a theatre, in order 'to put down an actor, obstruct the performance of a play, or compel the managers to lower the price of tickets, which amounts to a riot' and breach of the peace. So far is it from being true that conspiracy will lie for a private injury, which is no public wrong independently of the conspiracy, that these authors have not ■ cited a single .case which maintains such a doctrine. There is one, however, which I consider a perfect anomaly, as variant from the common law as from the principle of every other adjudged case. It is Rex v. Cope and others, 1 Stra. 144, the prosecutor was a manufacturer of playing cards; he is called the king’s card maker; the defendants were indicted of a conspiracy to ruin the trade of the-prosecutor, by hiring his apprentice to put grease into the paste, which spoiled his cards; and the defendants were convicted for what appears to me to be a mere civil injury. If this can be maintained, conspiracy may take the place of almost every civil action. We shall have conspiracies against two or more for non-payment of a note at its maturity, whereby the creditor suffers a private prejudice in his property or trade ; against two or more for conspiring to break their covenant; for the conversion of goods, and for agreeing to take a walk over their neighbor’s grounds; and judgments inflicting legal infamy will spread through the state. A foresight of these consequences led Mr. Ohitty to exclaim, with evident alarm, “ that there are, perhaps, few things left so doubtful in the criminal law, as the point at which a combination of several persons in a common object becomes *308] *indictable.” 3 Chit. Cr. L. 905. If private injuries, (in themselves not public wrongs) are, according to Mr. *383 Ohitty, indictable as conspiracies, his complaint is but too -well founded; but his doctrine is not only unsupported by any adjudged case, but the reverse of it was established by a solemn decision in the case of Rex v. Turner and others, 13 East. 228, which has settled the point in England, perhaps forever. The defendants conspired and combined together to invade by night a preserve for hares belonging to Gr., and to arm themselves with weapons, in order to resist any attempt to arrest them in snaring the hares of the owner; which conspiracy they carried into execution, and wore indicted and convicted. It was moved in arrest of judgment that this was a mere trespass on property, at most only an injury of a private nature, and was not an indictable offence. The counsel on the other side cited the leading cases collected in Archbold. Ellenborough, 0. J., delivered the opinion of the court that judgment be arrested. lie took notice of the distinction between private injuries and public wrongs. He said that Spragg’s case was a conspiracy to indict another of a capital crime, which no doubt is an offence. That Rex v. Eccles was considered as a conspiracy in restraint of trade, and, therefore, an act affecting the public. Then as to civil injuries, he said, I. should be sorry that the cases of conspiracy against individuals, which have gone far enough, should be pushed still further. I should be sorry to have it doubted whether persons agreeing to commit a civil trespass, should be in peril of an indictment which would subject them to infamous punishment. Now, a stronger case of mere prejudice to an individual and his property can hardly be conceived; it has the double aggravations of being done by night, when honest men are asleep, and with weapons avowedly prepared to break the peace in case they were attacked within the preserve; nay, the destruction of game by unqualified persons in England subjects them to a penalty on conviction before a magistrate. I concur most fully in the principles of this case. *384 Indictments are appropriated to public wrongs; and civil actions to private injuries. If, therefore, it be true, which at present I neither admit nor deny, that an indictment will lie for a conspiracy to commit every species of offence against the public, however small or trivial, such is, at least, the uttermost extension of the doctrine; beyond these limits no indictment for a conspiracy will lie.. This is evident, from the principle of every decision to be found in the *309] *books, except the anomalous case of the king’s card maker, which is pointedly overthrown by the last decisive case of Rex v. Turner. And it may be laid down as a settled rule, that an indictment will not lie for a conspiracy to commit a civil injury of any description that is not in itself a public offence.
The conspiracy in this indictment is for the commission of no crime or misdemeanor against the public; the fraud, if it be such, is against a private company, without the employment of false tokens, and is such as ordinary care on the part of the president, directors and company, would have guarded them against, and for which they may have a civil remedy. If they lent the money to the defendants without exacting security, and upon their individual credit, they took checks, which are as good as notes of hand or bills for the money. Every trading firm overdrawing its funds in the bank, would be liable to an indictment for conspiracy, on the same principle, and to lose their liberam legem, their right ever to be sworn as witnesses, or to serve on juries, and would become, as it is termed, infamous in law. It is not an unusual thing for.traders and dealers to overdraw their funds in bank, nor for directors to permit it to be done. It may be redressed as a- private wrong by an action of debt or assumpsit, to recover back the money; but in all its features it is a private transaction, which cannot, on any known principle, be wrought, up into a crime or misdemeanor against the public. For these reasons the indictment cannot be sustained, and in my opinion must be quashed.
*385 Drake, J.
A preliminary question lias been raised, as to the mode in which this indictment is presented to the consideration of this court. It is said that the English courts will not quash in cases of conspiracy, but leave the defendants to demur, move in arrest of judgment, or bring a writ of error. It is true that they appear unwilling to encourage this form of objecting to indictments. They say it is not ex. debito justiti®; and in the exercise of their discretion they refuse it in many eases of misdemeanors, and almost uniformly in cases of enormous crimes, as treason, forgery, perjury, &c. But the practice of this court is different. In 2 South. 541, it is laid down, that the court will never compel a defendant to file a demurrer to the insufficiency of an indictment. Nor is it easy to be seen why defendants .should bo compelled to move in arrest of judgment, or bring a writ of error. The *proper [*310 administration of the laws requires, on the one hand, that nice and technical objections should receive no more attention than the safety of the innocent, and the settled principles of adjudged cases require; and on the other, that where objections are worthy of notice, defendants should bo permitted, if not required, to raise them at the earliest stage after their nature is fully disclosed, and in the most easy form in which they can be fully and fairly discussed, and correctly decided.
There are several reasons relied upon to quash this indictment, only part of which 1 shall notice. The substance of the sixth, seventh and eighth is comprised in one of them, which is, “ Because the said indictment is vague, uncertain, illegal and defective, in form and substance.” Under this reason, counsel have taken a wide range in argument, inquiring into the nature and extent of this class of crimes, and the manner in which they should be charged in indictments. It has not been pretended, that in New Jersey, the crime of conspiracy is confined to the single class mentioned in our statute law; which,, notices only conspiracies falsely and *386 maliciously to indict other persons. Rut reference has been made to the statute, 33d Edward 1st, de conspiratoribus, as the foundation of the offence, or as defining it, if it existed' at common law. This idea has been frequently started in England, and in our sister states, and has been put down as often as raised. Conspiracy is a common law offence, and embraces many, but not all combinations to .injure individuals in their property, persons or character, and also cases where the object is to injure public trade, affect public health, violate public police, insult public justice, and to do other illegal acts. Hay, it seems not in all cases to be necessary that the act intended should be illegal, or even immoral, provided it is calculated to affect the public at large. But many of the general definitions to be found in the books, are too broad, and embrace cases which have been decided not to be indictable. “We can rest with safety,” says a good author, “ only on the individual adjudged cases, which depend, in general, on particular circumstancesand which, according to the opinion of an eminent judge, in a recent case, are not to be extended. 13 East 231.
From these it may be collected, that an indictable conspiracy is a combination between two or more persons “ to do an unlawful act, or to ¡do a lawful act for an illegal, fraudulent, malicious or corrupt purpose, or for a purpose *311] which has a tendency to prejudice *the public in general.” When the purpose is fraudulent, if the act be effected by an individual, the decisions are uniform, that some false token or pretence is necessary to constitute it an indictable offence. But it is said, and there are many respectable authorities in support of it, that a conspiracy to effect such purpose is criminal, without any such token or pretence; and that the conspiring together for such purpos'e constitutes the offence without the doing of the act.
Having premised these principles relative to the nature of the offence, let us enquire what is necessary to be shewn *387 in the indictment. “Every indictment must charge the crime with such certainty and precision that it may be understood by every one, alleging all the requisites that constitute the offence. And it must be sufficiently explicit to support itself, for no latitude of intention can be allowed to include anything more than is expressed.” Chitty 1139. &c. Now, an indictment for a conspiracy affecting an individual, or private corporation, should set out an unlawful act, or a lawful act to be accomplished by unlawful means, or aver an illegal, fraudulent, malicious or corrupt purpose. Let us examine this indictment, and see whether it is sufficient „in these particulars. And first, with respect to the purpose or object of the conspiracy. It is said that the defendants, (naming them) “ on the first day of May, in the year of our Lord one thousand eight hundred and twenty-five, with force and arms, at the township aforesaid, in the county aforesaid, did amongst themselves conspire, contrive, confederate and agree together, to obtain large sums of money and bank bills, the property of the president, directors and company of the State Bank at Trenton.”
The object of the conspiracy is then, to obtain the money and bank bills of the State Bank at Trenton. Prima facie, there is nothing illegal or immoral in this. The drawer and endorser of every accommodation noto enter into a conspiracy of this kind. It is the object of the corporation to have its bills obtained, used and circulated by others. But let us look a little further. Does the illegality consist in the means used? The indictment proceeds — -“by moans of the several checks of the said (defendants) respectively to be drawn on the cashier of the said the president, directors and company, of the State Bank at Trenton, when they (the ■ defendants) had no funds in the said bank for the payment of the said checks and drafts.” Upon this statement, not only no illegal *pnrpose is discoverable, but the [*312 means are fair, and in the usual course of business. To draw a check upon an individual or a corporation is a per *388 fectly lawful act, whether the drawer have funds in the hands of the drawee or not. A check, or draft, is a request to pay money to the drawer, or his order, as a right, if he have funds, but in some measure a matter of favor, if he have not. If there be funds belonging to the drawer, it is a demand of them; if not, it is a request of credit to that amount; and if advanced according to the request, a contract to repay is implied, and assumpsit-will lie for it. It is like any other contract, verbal or written, whereby the property of one person goes into the hands of another upon credit. And it is as much an indictable offence to purchase goods of a merchant without paying in advance or at the delivery, as to draw a check and obtain money without having funds in the hands of the drawee. But it is said, that if the act of overdrawing by an individual be not unlawful, combining to do it is. It is true that combinations make some acts indictable which would not be so if committed by an individual. But these are cases either affecting the public, as conspiracies to raise the price of wages, &c., or the act must be immoral at least, if directed merely against an individual. If an act be entirely innocent, and not injurious to the public, combining to do it cannot be criminal. I am aware that there are dicta in the books in opposition to this. Ohitty, in his treatise on criminal law, p. 1140, says, that “it may be inferred from the decisions, that to constitute a conspiracy it is not necessary that the act intended should be illegal or even.immoral; that it should affect the public at large; or that it should be accomplished by false pretences.” But an examination of the cases will not justify this inference. Indeed he acknowledges that “ it is impossible to conceive a combination, as such, to be illegal.”
I have thus considered the end or object of this conspiracy, and the means used, and nothing criminal appears. But what acts was done in pursuance of it ? “ The offence is complete when the confederacy is made, and any act done in pursuance of it is no constituent part of the offence, *389 but merely an aggravation of it.” 2 Mass. 329. .'But where the object stated is innocent, or ambiguous, perhaps we may look into the acts stated, to see if the uncertainty in the direct averment of the purpose is removed, and if anything can bo there discovered in the acts or purpose, of a character decidedly criminal. The indictment goes on to aver, in *substauco, that Lambert Eickey, in pursu- [*313 anee of said conspiracy, did obtain from the said company, a large sum of money, to wit, five thousand throe hundred and thirteen dollars, in bank bills of the said company, to the great damage, &c. This last expression, “ to the damage, &c.” is used in indictments of this description; hut I conceive it to be mere matter of form, if it be true that the offence is complete when the conspiracy is entered into. But whether formal or substantial, it is stated simply as the result of an act, and not as contemplated by the actor. It is not here alleged as the object of the conspiracy, nor oven of the individual who overdrew, and can constitute no part of the offence. Similar allegations are made with respect to the other defendants; but nothing is said or insinuated in this part of the indictment, of any improper design in this overdrawing. A purpose to appropriate the funds without accounting for them is not averred. It is not said to he done for the purpose of cheating or defrauding the bank. It is not even alleged that the drawers knew that they overdrew their accounts. We look in vain through the general statement of the conspiracy and its object, and all these specifications of acts done, for the slightest circumstance which can stamp the character of criminality oil this transaction.
But there is yet another part of this indictment which remains to be considered. It is the indictment, or prefatory part, in which it is said that the defendants, (naming them) “being evil disposed persons, wickedly designing and intending to injure and defraud the president, directors and company, of the State Bank at Trenton, did amongst thenfselves *390 conspire,” &c., and proceeding as before stated. It is said that the word defraud, here used, imports crime, and it is intimated that the fraudulent purpose of the confederacy is here sufficiently charged. If this indictment can be supported consistently with established and sound principles, it is very desirable that it should lie. And feeling the importance of the subject, I have attentively examined all the cases of conspiracy, -and forms collected by writers of reputation, and I find none where' an allegation of fraudulent purpose is made in this manner; although the idea that this will answer appears at first view to receive some countenance from cases of another nature reported in Croke James 610; 2 Mod. 128; 2 Strange 902; 6 East 474, and other authorities, where it is decided that the scienter is sufficiently averred by the word sciens or knowing : where *314] being of a certain *trade is necessary to constitute the crime, it is sufficient to aver it in those words in the introductory part of the indictment; and where a particular intent is a component part of a crime, it may be alleged in the prefatory part, “intending,” &c. Yet as in these cases the other component parts of the crime must be stated, so in conspiracy it must be laid as an agreement to do something. “ The law does not punish a mere unexecuted intention. It is not the bare intention, but the act of conspiring, which is made a substantive offence by the nature of the purpose, or object intended to be effected;” and that purpose or object must be averred.. In a conspiracy to cheat, that must be expressly alleged as the purpose, end, or object of the conspiracy, and not as the motive operating on the individuals, inducing their combination. They may come together with a view to a certain object, and may there conspire to effect quite a different one. The only question has been as to the degree of particularity with which the purpose of acts done should be set forth. This will depend upon the nature of the particular case. It has been decided that in a conspiracy to cheat and defraud,-it may be laid in *391 those words, without setting out the means. But it has never been decided that it is not necessary to set out the purpose or object either generally or particularly. Surely this would not be a good indictment if it terminated with the words, conspire, confederate and agree together.” If the word conspire imports a criminal or indictable agreement, yet no one in his senses could contend that it is sufficiently descriptive. It is quite enough to put defendants to answer to the general charge of conspiring to cheat and defraud ; they never can be called upon to answer to the far more indefinite charge of conspiring together. And yet this part of the indictment must stand alone if it is sustained. It can receive no assistance from what follows. Nay, in that part where a description of the crime with distinctness and ■certainty, and by positive averment is looked for, we find the transaction described to he of an ordinary business nature without the shadow of crime, and such in principle as many of the best men in the country are daily engaged in. It is evident that if in stating the object of the conspiracy, its character is wholly innocent, or if immoral or illegal, yet of that character where conspiracy will not lie, as in case of an ordinary trespass, such for instance as the case of hunting hares, reported in 13 East 228, the indictment cannot be sustained by the formal expressions as to intention, contained *in the introductory part. It is true that if the [*315 intention he there distinctly stated, it may be made the foundation of the express averment of the purpose, and save the necessity of repetition, being introduced into the description of the object by the words “for the purposes aforesaid,” or other equivalent words; but this prefatory part of the indictment cannot stand alone, much less can it convert into a crime a combination the object or purpose of which as stated, is entirely innocent. I am of opinion, therefore, without considering the other points raised, that this indictment must be quashed.
Lot the indictment be quashed.